# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CLARK BEAUREGARD )
WATERFORD #168248, )
                    )
        Petitioner, )
                    )      NO.  3:19-cv-00651
v. )      JUDGE TRAUGER
                    )
WARDEN RUSSELL )
WASHBURN, )
                    )
        Respondent. )

## MEMORANDUM OPINION

The petitioner, Clark Waterford, is a state prisoner incarcerated in the Trousdale Turner Correctional Complex, where she is serving a forty-year prison sentence for second-degree murder.[1]  She filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 and paid the filing fee. (Doc. Nos. 1, 5.)  The court will deny the petition for the reasons explained below.

## I.      FACTS AND PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals summarized the evidence and outcome at the petitioner's trial as follows:

> At approximately 6:00 a.m. on May 11, 2010, Clayton Harris found the body of the victim, Faye Burns, lying in a puddle of blood on her bedroom floor next to her bed. There were significant amounts of blood on the bed, the floor, and the victim. By the time the police arrived, the blood appeared to be "somewhat coagulated." The victim's shirt and bra had been partially removed, exposing part of her breasts. The victim's pants were still on, but they had been "unbuttoned and unzipped." The room appeared to be in disarray, as if there had been some kind of struggle. Various objects had been knocked over, items were scattered across the floor, and there was

---

[1] The Petition uses masculine pronouns to refer to the petitioner. (Doc. No. 1 at, e.g., 2, 5, 7.) However, the petitioner's submissions indicate that she is transgender and has previously requested to be referenced by feminine pronouns (*id.* at 37), and the petitioner's Reply refers to her with feminine pronouns. (Doc. No. 23.)  Accordingly, although this court will not alter the language of quoted text by the state courts in the underlying record of this case, this court will use feminine pronouns when referring to the petitioner.

some broken glass on the floor. A knife and a glass ashtray were found in the bedroom. The knife was clean and had no blood or fingerprints on it. A change purse was also found in the bedroom, but it contained no money.

In addition to the blood found in the victim's bedroom, the police found blood stains on the sink and toilet in the victim's bathroom. A towel that appeared to be stained with blood was found on the floor outside the bathroom. There were five red stains that appeared to be blood on the wall of a staircase leading to the downstairs area of the victim's apartment. There were also two small stains that appeared to be blood on the front door of the apartment. There was no evidence that anything had occurred in the downstairs portion of the apartment. The police were unable to obtain any useful fingerprints inside the victim's apartment. The police did locate a receipt from a local Dollar General Store in an unused bedroom in the apartment. The receipt was dated May 10, 2010, and time-stamped at 8:46 p.m.

Mr. Harris testified that he was the victim's boyfriend and that he spent most nights at the victim's apartment. According to Mr. Harris, the victim would drink until she was intoxicated five or six days a week. Mr. Harris testified that when the victim got "full of them drinks" she would "get to raising hell, playing loud ass music, and cursing, and picking up things and throwing them." Mr. Harris stated that when the victim became belligerent, he would leave the apartment and return the next morning. Mr. Harris claimed that the victim had previously scratched his neck and slammed his thumb in a door but that those were the only times she had ever physically hurt him.

Mr. Harris testified that on May 10, 2010, he received some money and gave the victim fifty dollars. He and the victim ran some errands and did some shopping that morning before returning to the victim's apartment. Mr. Harris admitted that he "started getting high" while at the apartment and that he had smoked crack cocaine that day. Mr. Harris believed that the victim had also smoked cocaine that afternoon. The victim's friend, Michael Eubanks, came to the apartment and spent the afternoon with the victim and Mr. Harris. At some point, the victim left to purchase a fifth of whisky. Mr. Harris testified that when the victim returned, she drank "that whole fifth of [whisky] like it was water."

According to Mr. Harris, sometime around 4:30 p.m. "all hell broke loose" and the victim "started acting a fool and cussing" him and Mr. Eubanks, calling them "all kinds of b——hes and hoes." Mr. Harris testified that the victim took his cell phone and slung it at Mr. Eubanks, "hit[ting] him upside the face." Mr. Eubanks left shortly after that, around 5:00 p.m. A short time later, the victim kicked Mr. Harris out of the apartment. Mr. Harris told the victim that he would be back the next morning to get his clothes. Mr. Harris testified that there was no physical altercation between him and the victim and that he left when she told him to. Mr. Harris then went to a friend's house where he spent the night. The police later confirmed that Mr. Harris had stayed with a friend that night.

Mr. Eubanks testified at trial that he was a close friend of the victim and that he had been at her apartment all day on May 10, 2010. Mr. Eubanks admitted that he sold crack cocaine to Mr. Harris and that he and the victim would "just [get] high

2

together." Mr. Eubanks claimed that he did not have any cocaine that day but had "smoked weed" instead. Mr. Eubanks testified that the victim would get "a little belligerent" and "might get loud" when she was drunk but that she had never assaulted him. Mr. Eubanks testified that he left the victim's apartment sometime after 5:00 p.m. Mr. Eubanks claimed that he did not leave because the victim threw a cell phone at him. According to Mr. Eubanks, the victim "tossed" the phone and "accidently hit [him] in the side of the head." Mr. Eubanks testified that he left because the victim was getting drunk but stated that she "was acting fine" when he left.

Mr. Harris testified that the victim did not have a phone but that she called him around 9:00 p.m. that night from a number he did not recognize. The victim asked Mr. Harris to come back to her apartment, but Mr. Harris said to her, "F—k you, b——h, I ain't coming back down there no more til in the morning [to] get my clothes." Mr. Harris testified that the victim continued to call him until 3:00 a.m. that morning, but he did not answer any more of her phone calls. The next morning, Mr. Harris went to the victim's apartment and found the screen door and front door both unlocked. Mr. Harris went into the apartment and saw that the bedroom light was on. He called for the victim and went upstairs to the bedroom when he got no response. Mr. Harris saw the victim's body and touched her chest to see if she was still alive. Mr. Harris testified that he believed the victim was dead so he ran outside and called 911. Mr. Harris waited outside for the police and then cooperated with their investigation.

Detective Johnny Crumby of the Metropolitan Nashville Police Department (MNPD) testified that he was the lead investigator in this case. Det. Crumby interviewed Mr. Harris and examined Mr. Harris's cell phone. Det. Crumby testified that on May 10, 2010, Mr. Harris received several phone calls between 9:22 and 9:55 p.m. from two phone numbers belonging to the Defendant. Det. Crumby also testified that based upon the Dollar General Store receipt found in the victim's second bedroom, he retrieved the store's video surveillance footage in hopes of seeing who the victim was with that night. Instead, the footage showed the Defendant, wearing an orange reflective vest and with his hair styled in a unique manner, making a purchase alone. Mr. Harris testified that he had never met the Defendant, but the victim had talked about him. Mr. Eubanks testified that he had met the Defendant at the victim's apartment and that the victim "fed [the Defendant], housed him, [and] clothed him." Mr. Eubanks further testified that the victim let the Defendant stay at her apartment "when he didn't have [anywhere else] to go."

After the victim's murder, the Defendant fled to Missouri. The Defendant was eventually apprehended and returned to Tennessee. The Defendant waived his Miranda rights and agreed to speak with Det. Crumby. During their conversation, the Defendant asked Det. Crumby if "there [was] any such thing as self-defense in this state," and Det. Crumby responded that there was. The Defendant then told Det. Crumby that he had "been a victim of some things before" and that several years earlier he had been kidnapped and severely beaten by a woman. The Defendant told Det. Crumby that he did not "want that to happen a second time."

3

The Defendant claimed that the victim was "very abusive to a number of people" and that she had "victimized" him in the past. The Defendant told Det. Crumby that he was taking a bath at the victim's apartment when she became very upset because he had accidentally used one of her towels and "then that's when the altercation began." The Defendant claimed that the victim "confronted [him] as soon as [he] got out of the bathtub" and that she "started throwing things and pulling that little knife." Det. Crumby asked the Defendant if he then "just defended [himself]," and the Defendant responded, "right." The Defendant told Det. Crumby that the evidence against him appeared "to be irrefutable."

Det. Crumby testified that he did not know who owned the knife found in the victim's bedroom. Mr. Harris testified that he had never seen the knife before and that he did not believe it belonged to the victim because she "wasn't the type to carry [a] weapon around with her." Additionally, the victim's daughter testified that her mother did not carry a knife or any other weapon. The victim's daughter also testified that her mother would carry her money either in her bra or in a change purse that she would sometimes place in her bra. Det. Crumby testified that he decided not to have any forensic tests performed on the blood and DNA evidence found in the victim's apartment after he interviewed the Defendant.

Dr. John B. Davis, an expert in forensic pathology, testified that he performed an autopsy on the victim. Dr. Davis determined that the victim was killed by a stab wound to the left side of her neck. The wound "cut through the carotid artery . . . and also damaged her esophagus." Dr. Davis testified that severing the carotid artery "would be very bloody" and that, due to the damage to the esophagus, the victim likely bled into the esophagus and swallowed "quite a bit of blood." Dr. Davis estimated that it took from a few minutes to thirty minutes for the victim to die from the stab wound. Dr. Davis testified it was possible the victim could have survived had medical help been sought, but he noted that if no pressure was applied to the wound, the victim would have suffered "a relatively short death." A close examination of the wound showed that the knife had been twisted before it was removed.

The victim also suffered a small stab wound on her left arm and several incised wounds on her left arm, neck, and breasts. Dr. Davis testified that he found two incised wounds, approximately two inches long, on the underside of each of the victim's breasts. Dr. Davis testified that the victim's breasts were large and that the area where the wounds were located would not normally be exposed. Dr. Davis explained that the victim's shirt and bra would have to be removed and her breasts would have to be "lifted" in order for the incised wounds to be made at that location. Dr. Davis testified that he found no holes in the victim's clothing. The victim also suffered blunt force trauma injuries to the left side of her head and abrasions on her nose. Dr. Davis testified that these injuries were consistent with the victim having struck her head on a hard object or being struck in the head with a hard object. Dr. Davis further testified that it was possible the victim had been knocked unconscious.

Dr. Davis testified that the knife found in the victim's bedroom could have cause her stab and incised wounds, including the fatal wound to her neck. Dr. Davis

opined that all of the victim's wounds were inflicted around the same time. Dr. Davis further opined that the fact that the blood was centered on the left side of the victim's bed and the floor was consistent with the victim having been lying down on the bed when she was stabbed in the neck. Dr. Davis noted that there were no defensive wounds on the victim's hands. The victim had both alcohol and cocaine in her blood at the time of her death. Dr. Davis testified that the victim's blood alcohol content was .28 percent, over three times the legal limit for driving in Tennessee.

Based upon the foregoing evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder. Following a sentencing hearing, the trial court sentenced the Defendant as a Range II, multiple offender, to a sentence of forty years. The trial court placed great weight [on] the Defendant's extensive criminal history which included prior convictions for burglary, rape, attempted rape, two aggravated assault convictions, reckless endangerment involving a deadly weapon, and three convictions for failure to register as a sex offender. The trial court also noted that the Defendant used a deadly weapon during the commission of the offense and that the Defendant was on probation when the offense was committed. The trial court concluded that these factors outweighed any possible mitigating factors.

*State v. Waterford*, No. M2011-02379-CCA-R3CD, 2013 WL 2368830, at *1–4 (Tenn. Crim. App. May 30, 2013); (Doc. No. 11-13 at 2–5).

The Tennessee Court of Criminal Appeals affirmed the conviction and sentence on direct appeal, and the Tennessee Supreme Court denied discretionary review on October 25, 2013. (Doc. Nos. 11-13, 11-17.)

In August 2012, while her direct appeal was still pending, the petitioner filed a *pro se* petition for DNA analysis in state court. (Doc. No. 11-18 at 6.) At the trial court's instruction, the state responded in opposition to the petition on September 26, 2012. (*Id.* at 10, 11.) Acting through counsel, the petitioner withdrew her DNA analysis petition on January 23, 2013, preserving her right to resubmit her DNA issue later in conjunction with other claims in an anticipated post-conviction petition. (*Id.* at 18.)

On August 7, 2014, the petitioner filed a *pro se* post-conviction petition in the trial court (Doc. No. 11-18 at 35–48.) The court appointed counsel (*id.* at 49), who filed an amended petition

5

on March 12, 2015 (*id.* at 50–60), along with a new petition for DNA analysis. (*Id.* at 61–91.) The trial court held a hearing on the DNA request on May 1, 2015 (*id.* at 92), and granted the motion by written order entered June 1, 2015. (*Id.* at 93.) The results of the court-ordered DNA testing were submitted to the court on December 14, 2016. (*Id.* at 113–15.)

Counsel filed a second amended post-conviction petition on the petitioner's behalf on January 25, 2017. (Doc. No. 11-18 at 94–109.) The trial court held an evidentiary hearing on the petition on August 18, 2017 (*id.* at 119), and denied relief on September 6, 2017. (Doc. No. 11-19 at 3–34.) The Tennessee Court of Criminal Appeals affirmed the denial of relief on October 16, 2018 (Doc. No. 11-27), and the Tennessee Supreme Court denied discretionary review on March 27, 2019. (Doc. No. 11-30.)

The petitioner filed her pending Section 2254 petition in this court on or about July 29, 2019 (*see* Doc. No. 1 at 42–43 (postmark and prison date stamp)), and the respondent acknowledges that it is timely. (Doc. No. 13 at 2.)

## II.    ISSUES PRESENTED FOR REVIEW

The petition raises the following claims for relief:

1. The evidence at trial was insufficient to support the conviction. (Doc. No. 1 at 5.)

2. The trial court erred by ruling that the petitioner's prior convictions would have been admissible impeachment material if she testified. (*Id.* at 7.)

3. The petitioner's sentence is excessive. (*Id.* at 8.)

4. The petitioner's trial counsel was ineffective for failing to request DNA testing, failing to offer an explanation for the wounds on the victim's breasts, and failing to highlight wounds on the victim's boyfriend. (*Id.* at 10.)

5. The prosecution suppressed DNA evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*)

6. Trial in the absence of DNA evidence violated due process. (*Id.*)

## III.    STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application

7

of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough

8

for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the

9

procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause,

10

petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## IV. ANALYSIS

### A. INSUFFICIENT EVIDENCE

The petitioner alleges that the evidence at trial was insufficient to sustain her conviction for several reasons. First, the petitioner asserts that her identity as the perpetrator was not established because there was no physical evidence connecting her with the victim's death. (Doc. No. 1 at 5, 27.) Alternatively, she asserts that the evidence establishes that she acted either in self-defense or in a state of provoked passion, and she was therefore not guilty of second-degree murder. (*Id.* at 5, 27.)

The petitioner exhausted her insufficient-evidence claim on direct appeal, and the Tennessee Court of Criminal Appeals rejected it:

> The Defendant contends that the evidence was insufficient to sustain his conviction for second degree murder. The Defendant argues that the State failed to establish his identity as the perpetrator of the crime because it did not present any physical evidence to "directly implicate [him] in the victim's death." The Defendant also argues that the evidence established that he acted in self-defense. Alternatively, the

11

Defendant argues that the evidence showed that he acted in a state of passion produced by adequate provocation; therefore, he was guilty of voluntary manslaughter rather than second degree murder. The State responds that the Defendant's identity as the perpetrator was established by circumstantial evidence and his statements to Det. Crumby. The State further responds that the evidence contradicted the Defendant's claim he acted in self-defense and that it was within the prerogative of the jury to reject his claim. The State also responds that the jurors were properly instructed on the difference between second degree murder and voluntary manslaughter and that the evidence was sufficient to support their verdict of second degree murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 392–93 (Tenn. Crim. App. 1999). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39–13–210(a)(1). A person acts knowingly with respect to the result of the person's conduct "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39–11–302(b). The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

We conclude that the evidence was more than sufficient for the jury to conclude that the Defendant perpetrated the victim's murder. It was established at trial that the victim knew the Defendant and that she gave him food and clothes in addition to letting him stay at her apartment whenever he needed to. A receipt from a local Dollar General Store was found in the victim's apartment time-stamped for 8:56 p.m. on May 10, 2010. Video surveillance footage showed the Defendant,

12

distinctively dressed, making a purchase at the Dollar General Store that night. The victim called Mr. Harris several times from phone numbers belonging to the Defendant between 9:22 and 9:55 p.m. that night. The Defendant fled the state the day after the victim's murder. The Defendant admitted to Det. Crumby that he had been in the victim's apartment on the night of May 10, 2010, and that an "altercation" had occurred between the two of them. When asked if he "just defended [himself]," the Defendant responded, "right." Based upon the foregoing evidence, we conclude that the Defendant's contention that the State failed to establish his identity as the perpetrator of the offense is without merit.

The Defendant next argues that the evidence established that he acted in self-defense. Tennessee law provides that a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39–11–611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

The Defendant told Det. Crumby that he got into an "altercation" with the victim after she discovered he had mistakenly used one of her bath towels. The Defendant claimed that the victim became very upset, started throwing things at him, and "pulling that little knife." However, the evidence presented at trial contradicted the Defendant's claim. Mr. Harris testified that he had never seen the knife found in the victim's bedroom, and both he and the victim's daughter testified that the victim did not carry a knife with her. Dr. Davis testified that the victim had no defensive wounds on her hands and that she suffered blunt force trauma to her head which possibly rendered her unconscious. Dr. Davis further testified that the victim suffered incised wounds on the underside of both her breasts which required that her shirt and bra be partially removed. Dr. Davis also opined, based upon the location of the blood in the victim's bedroom, that the victim had been lying on the bed when she was fatally stabbed in the neck. Based upon the evidence presented at trial, it was well within the province of the jury to reject the Defendant's claim of self-defense. Accordingly, we conclude that this issue is without merit.

The Defendant also contends that the proof established that he committed voluntary manslaughter rather than second degree murder. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39–13–211(a). The trial court instructed the jury on the lesser-included offense of voluntary manslaughter as well as the distinction between voluntary manslaughter and second degree murder. It is a jury question whether a knowing killing constituted second degree murder or voluntary manslaughter. *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) (citing *State v. Johnson*, 909 S.W.2d, 461, 464 (Tenn. Crim. App. 1995)). Again, it was well within the province of the jury to reject the Defendant's claim that he killed the victim after she attacked him. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for second degree murder.

(Doc. No. 11-13 at 6–8.)

The state court correctly identified and summarized the *Jackson* standard applicable to federal claims challenging the sufficiency of evidence to support a conviction. As explained above, therefore, the petitioner can only prevail on this claim in the habeas context if the state court's determination amounts to an unreasonable application of *Jackson*.

Analysis of an exhausted insufficient-evidence claim in the habeas context is doubly deferential: "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This review imposes a "standard . . . so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). Jurors have "broad discretion in deciding what inferences to draw from the evidence," and when there are "a number of plausible ways to interpret the record," the state court's interpretation must not be disturbed by a habeas court as long as it is among those plausible interpretations. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam); *Renico v. Lett*, 559 U.S. 766, 778 (2010). The Supreme Court has explained how constrained a federal habeas court's review in these circumstances is:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this

14

settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

Accordingly, a federal court reviewing the sufficiency of the evidence on habeas review may not re-weigh evidence. *Marshall v. Lonberger*, 459 U.S. 422, 434, (1983). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296–97 (1992).

As the state court observed, the receipt, the multiple phone calls by the victim on the petitioner's phone, and the petitioner's statement all established the petitioner's presence in the victim's home the night she was killed. In addition, the petitioner admitted having an "altercation" with the victim that night, and she fled the state the next day. In light of that evidence and the two layers of deference this court must give to the jury and to the reviewing state court, the conclusion that the petitioner was the perpetrator was not unreasonable, despite the lack of any forensic evidence to support it.

Turning to the petitioner's claim that the evidence was insufficient to outweigh her claim of self-defense or to prove that she was guilty of more than voluntary manslaughter, medical testimony indicated that the victim had sustained a blunt force trauma to her head possibly sufficient to render her unconscious, that she had no defensive wounds indicative of a struggle, and that she was likely lying on her bed when she was stabbed in the neck. She also sustained an incised wound under each breast, which required partial removal of her clothing and manipulation of her body. The petitioner does not explain how those wounds are compatible with a theory of self-defense or provocation. Even if those were also plausible theories, second-degree murder was

certainly among the plausible inferences the jury was entitled to draw from the same facts. The petitioner has not established that the state court's conclusion to that effect was objectively unreasonable.

The petitioner is not entitled to relief on this claim.

## B.    EVIDENTIARY RULING

The petitioner asserts that the trial court erred in holding that her prior convictions for aggravated assault could be used as impeachment evidence if she testified at trial and that the Tennessee Court of Criminal Appeals erred in denying relief on that claim on direct appeal. The appellate court succinctly summarized and rejected the petitioner's claim:

> The Defendant contends that the trial court erred by ruling that his prior convictions for aggravated assault would have been admissible for impeachment purposes had he chosen to testify at trial. The Defendant argues that the probative value of these convictions on the Defendant's credibility was outweighed by their unfair prejudicial effect on the substantive issues due to the similarity between the aggravated assault convictions and the charged offense of first degree premeditated murder. The State responds that the Defendant's convictions for aggravated assault were sufficiently dissimilar to the indicted charge of first degree premeditated murder that their probative value as to credibility was not outweighed by their unfair prejudicial effect on the substantive issues.
>
> Prior to trial, the State filed a notice of intent to use convictions for impeachment purposes listing ten of the Defendant's prior convictions. The Defendant filed a "motion for determination of convictions for impeachment" in response. The trial court held a pretrial hearing at which it reviewed all of the Defendant's prior convictions. The trial court limited the State to using only the Defendant's convictions for rape, attempted rape, and aggravated assault as impeachment evidence. Defense counsel raised the issue with the trial court again during the State's case-in-chief. Defense counsel objected to the use of the rape and attempted rape convictions given that the victim's shirt and bra had been partially removed, and the trial court altered its initial ruling to limit the State to using only the Defendant's convictions for aggravated assault. At no point did the Defendant object to the use of the aggravated assault convictions on the grounds that they were substantially similar to the charged offense. The Defendant subsequently decided not to testify at trial.
>
> Tennessee Rule of Evidence 609 allows a witness to be impeached by evidence of a prior criminal conviction so long as the convicting offense was a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a). Evidence of a

16

conviction is not admissible if "a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution." Tenn. R. Evid. 609(b). When the witness to be impeached is the defendant in a criminal prosecution, "the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). A trial court's ruling on the admissibility of a prior conviction for impeachment purposes is reviewed on appeal under an abuse of discretion standard. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003).

Violent felonies "reflect on the moral character of a witness" and are "not usually without probative value." *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). Additionally, the "mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997). However, there is a danger "that jurors will erroneously utilize [an] impeaching conviction as propensity evidence" when the impeaching conviction is "substantially similar to the crime for which the defendant is being tried." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). Here, there was nothing in the record to suggest that the Defendant's prior convictions for aggravated assault were substantially similar to the charged offense of first degree premeditated murder in any way except for the fact that each offense was a crime involving violence. Absent any evidence that the crimes were substantially similar, we will not overturn the trial court's ruling. *See State v. Burl Lakins*, No. 32, 1991 WL 84947, at *3 (Tenn. Crim. App. May 24, 1991) (holding that a prior conviction for second degree murder could be used to impeach the defendant in a prosecution for aggravated assault). Therefore, we conclude that this issue is without merit.

(Doc. No. 11-13 at 8–9.)

The respondent argues that the petitioner's current claim is not cognizable under Section 2254 because it asserts only violation of state evidentiary law and, alternatively, that any federal claim raised in Claim 2 of the current petition was not raised in state court and is therefore procedurally defaulted. (Doc. No. 13 at 15–18.)

The claim is actually non-cognizable for an even clearer reason lodged in United States Supreme Court precedent. The petitioner did not testify at trial, and "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Luce v. United States*, 469 U.S. 38, 43 (1984). That is because, without such testimony, reviewing

17

courts are unable to balance the probative value of the impeachment evidence against its effect on the case as a whole, and "[a]ny possible harm flowing [from the trial court's ruling] is wholly speculative." *Id.* at 41. Although *Luce* arose from a federal prosecution, the rule it announced also bars Section 2254 habeas claims that a state court erred in ruling that a defendant's prior conviction would be admissible when such claims are brought by petitioners who did not actually testify. *See Davis v. Larson*, 769 F. App'x 233, 239 (6th Cir. 2019), *reh'g denied* (May 9, 2019) ("Davis voluntarily decided not to testify at trial, leaving his claim unpreserved for our review.")

The respondent does not raise the *Luce* bar, but he does correctly assert the bar of procedural default. The petitioner asserted in her brief on direct appeal, as she does now, that the trial court's ruling was in error because the probative value of her aggravated assault convictions was outweighed by the "unfair prejudicial effect on the substantive issues" in her case. (Doc. No. 1 at 7; Doc. No. 11-11 at 26, 28.) Unlike the petitioner's state appellate brief, her current petition adds that the trial court's error violated her "fundamental and constitutional right to a fair trial" and that "not only for the Rule 609 of the Tennessee Rules of Evidence, but for the fundamental fairness of the case, Petitioner's prior conviction should have been excluded to ensure Petitioner's constitutional right to testify." (Doc. No. 1 at 7, 29, 31–32.) And in her Reply, she cites federal cases in support of her asserted right to "fundamental fairness." (Doc. No. 23 at 7.) But even assuming those vague assertions of broad constitutional rights are sufficient to state a federal claim for relief in the current petition, any such claim was not fairly presented in state court.

For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). The claim must be presented to the state courts as a federal constitutional issue, not merely as an issue arising

18

under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; (3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner*, 581 F.3d at 414.

In connection with this claim on direct appeal, the petitioner relied on Tennessee Rule of Evidence 609 and five Tennessee court opinions applying that rule: *State v. Mixon*, 983 S.W.2d 661 (Tenn. 1991); *State v. Farmer*, 841 S.W.2d 837 (Tenn. Crim. App. 1992); *Long v. State*, 607 S.W.2d 481 (Tenn. Crim. App. 1980); *State v. Blanton*, 926 S.W.2d 953 (Tenn. Crim. App. 1996); and *State v. Roberts*, 703 S.W.2d 146 (Tenn. 1986).[2] (Doc. No. 11-11 at 27–28.) None of that authority identifies any federal constitutional right or employs federal constitutional analysis. Only one of the cases on which the petitioner relied in state court even cites a federal court

---

[2] The respondent references a citation in the petitioner's state appellate brief to *Old Chief v. U.S.*, 519 U.S. 172 (1997). (Doc. No. 13 at 18.) The respondent does not cite any page of the record in this court in connection with that reference, and the court has been unable to locate any such citation in the petitioner's state-court brief.

decision: *Long* cites *United States v. Mahone*, 537 F.2d 922, 928 (7th Cir. 1976), which applied Federal Rule of Evidence 609(a), for the proposition that trial courts should make an explicit finding on the record of their reasons for admitting or excluding prior convictions to enable appellate review. *Long*, 607 S.W.2d at 485. Accordingly, any federal constitutional claim raised in Claim 2 of the pending petition is procedurally defaulted and barred from federal review.

And finally, this claim would fail on its merits even if it were subject to habeas review. The Sixth Circuit has explained that habeas relief is rarely appropriate in connection with a state court's rulings on the admissibility of evidence:

> With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). Even if errors are made in the application of state law, "[such] errors . . . especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.), *cert. denied*, 464 U.S. 962 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id.*

*Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017). Accordingly, the petitioner can only prevail on this claim by demonstrating a fundamental violation of due process. But the petitioner does not cite any federal authority supporting the proposition that evidence of a prior conviction for aggravated assault constitutes a fundamental due process violation in a murder trial. To the

contrary, the Sixth Circuit has explained that admissibility of prior convictions for impeachment purposes "is a question not reaching constitutional dimensions." *Hall v. Grant*, 780 F.2d 1021 (6th Cir. 1985) (quoting *Luce*, 469 U.S. at 42–43).

The petitioner is thus not entitled to relief on Claim 2.

## C.  EXCESSIVE SENTENCE

The petitioner asserts that the trial court erred in imposing the maximum sentence allowed under Tennessee law, and that her sentence consequently violates the Eighth Amendment as a cruel and unusual punishment. (Doc. No. 1 at 8, 32–33.)  On direct appeal, the petitioner claimed that her sentence was "greater than that deserved for the offense committed" (Doc. No. 11-11 at 29–34), and the Tennessee Court of Criminal Appeals rejected her argument:

> The Defendant contends that the trial court erred by imposing a forty-year sentence, the maximum possible for a Range II, multiple offender. The Defendant argues that the trial court failed to apply several mitigating factors and that the sentence was greater than that deserved for the offense. The State responds that the trial court imposed a sentence consistent with the principles and purposes of the Criminal Sentencing Reform Act of 1989 (Sentencing Reform Act).
>
> Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range ... under an abuse of discretion standard with a presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682, 709 (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] ... have been properly addressed." *Id.* at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. *State v. Carter*, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute...." *Bise*, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40–35–401(d), Sentencing Comm'n Cmts.
>
> The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40–35–102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be

the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40–35–103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40–35–103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40–35–103(5).

Here, the trial court imposed the maximum sentence within the appropriate statutory range. The trial court entered a detailed sentencing order examining both the State's proposed enhancement factors and the Defendant's proposed mitigating factors. The trial court placed great weight on the fact that the Defendant had an extensive history of criminal convictions including convictions for burglary, rape, attempted rape, aggravated assault, reckless endangerment involving a deadly weapon, and failure to register as a sex offender. The trial court also considered the fact that the Defendant was on probation when he committed this offense and that he used a deadly weapon in the commission of the offense. The trial court examined all of the Defendant's proposed mitigating factors but found that only one mitigating factor applied, that the Defendant had attempted to be a model inmate. The trial court concluded that this factor was greatly outweighed by the enhancement factors. The record before us shows that the trial court fully considered the purposes and principles of the Sentencing Reform Act. Accordingly, we affirm the trial court's sentencing decision.

(Doc. No. 11-13 at 9–11.)

The petitioner argues that the trial court should have found several more mitigating factors applicable to her case (Doc. No. 1 at 33), but those factors are a matter of state law for state courts to interpret and apply. Absent evidence that a petitioner's sentence exceeded the statutory maximum for her crime, the length of her sentence is typically not cognizable in federal habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373–74 (1982); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000). The petitioner's sentence was within the statutory range for her offense, and the state court reasonably found that a sentence at the highest end of the range was

warranted by the petitioner's prior convictions and other enhancement factors. In the absence of any federal law dictating against any of those determinations, they cannot be the basis for relief under AEDPA.

Moreover, even assuming that the petitioner's bald reference to the Eighth Amendment is sufficient to assert a federal right in this proceeding, the petitioner did not assert any federal right in her state-court appeal. The relevant portion of her brief relied exclusively on Tennessee statutes and Tennessee decisional law applying them and made no reference to the Eighth Amendment or any federal precedent. (Doc. No. 11-11 at 29–34.) Accordingly, any federal claim in connection with the petitioner's sentence is procedurally defaulted and cannot form the basis for federal habeas relief.

The petitioner is not entitled to relief on Claim 3.

D. INEFFECTIVE ASSISTANCE

The petitioner alleges that trial counsel was ineffective for: (1) failing to request DNA testing of evidence collected; (2) failing to offer an explanation for the wounds on the victim's breasts; and (3) failing to highlight the documented wounds on the victim's boyfriend, Mr. Harris. (Doc. No. 1 at 10, 34–35, 37–38.) She suggests that counsel was intentionally ineffective because of his prejudice against the petitioner's transgender identity. (*Id.* at 37–38.)

The petitioner raised all three of these ineffective-assistance claims in state post-conviction proceedings. (Doc. No. 11-27 at 9.) But on appeal from the denial of post-conviction relief, she asserted only one of those claims—that counsel was ineffective for failing to request DNA testing. (Doc. No. 11-25 at 2; Doc. No. 11-27 at 12.) By failing to appeal the trial court's adverse decision on the other two ineffective-assistance claims, the petitioner procedurally defaulted those claims, and she cannot rely on any ineffectiveness by post-conviction counsel as cause to excuse those

23

defaults. *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015).

Accordingly, this court's review is limited to the exhausted claim concerning counsel's failure to seek DNA testing of the evidence. The Tennessee Court of Criminal Appeals summarized the facts relevant to that claim:

> At trial, Detective Crumby testified that after the interview, he did not believe any DNA testing was necessary because the Petitioner had acknowledged being present at the scene of the crime, and the Petitioner's DNA would presumably be present. Detective Crumby elaborated that he would expect to find his own DNA under his wife's fingernails if she were to scratch his back or rub his head. On cross-examination, he acknowledged that he had obtained a DNA standard from the Petitioner in February, and he testified, "[W]e did at [the prosecutor's] request send the evidence off." A report from the Tennessee Bureau of Investigation ("TBI") indicates that the agency received the DNA standard from the Petitioner on May 4, 2011. The trial commenced on May 23, 2011, prior to any testing being performed. Trial counsel argued in closing argument that the State's case was weakened by its failure to test the physical evidence.
>
> . . .
>
> On August 4, 2011, prior to the hearing on the Petitioner's motion for a new trial, the TBI issued its report analyzing the physical evidence. The report indicated that a DNA profile was obtained from the victim's fingernail scrapings and that the profile belonged to an unknown male who was not the Petitioner. The victim's fingernail clippings indicated no DNA other than her own. The record does not reveal when the prosecutor became aware of this report.
>
> . . .
>
> The Petitioner also requested [during post-conviction proceedings], pursuant to the Post-Conviction DNA Analysis Act of 2001, DNA testing of the knife that the State theorized was the murder weapon, and the State did not oppose the motion. The knife was found neatly placed on a pillow next to an ashtray, on the side of the bed that did not show extensive blood stains. Chemical testing showed that the knife bore no traces of blood, but two incomplete DNA profiles were present on the blade. Both the victim and the Petitioner were excluded as possible contributors to the two profiles obtained from the blade. The handle revealed traces of DNA, but the profile obtained was so limited that the results of comparison to the DNA of the Petitioner and victim were inconclusive.
>
> At the post-conviction hearing, the Petitioner's trial counsel testified that he had worked for the public defender's office for over twenty years, handling exclusively criminal matters, particularly serious, violent felonies. He had tried numerous murder cases, including cases involving DNA evidence and death penalty cases. Trial counsel filed a discovery request which asked the State to disclose any exculpatory material, including "the results of any scientific tests" which "did not

24

implicate or w[ere] neutral to" the Petitioner. Trial counsel testified that he was aware that physical evidence, including fingernail scrapings and a knife, was collected, but he was not aware that the State submitted any items to the TBI for DNA testing. He first became aware that the victim's fingernail scrapings were submitted for analysis during trial, when Detective Crumby testified that the assistant district attorney general had requested him to obtain analysis of the scrapings and that the scrapings were submitted for analysis. Trial counsel stated that he would have asked for a continuance if he had known that the DNA had been submitted for testing and that he would have asked for testing of other items and independent testing.

Trial counsel testified that because the Petitioner had admitted being involved in an "altercation" with the victim, trial counsel expected that the Petitioner's DNA might be present under the victim's fingernails even if a third party assailant were the actual subsequent murderer. He agreed that because the Petitioner had admitted to an altercation, DNA evidence showing the Petitioner's DNA under the victim's fingernails would not have been particularly damaging to the Petitioner's case, while evidence of a third party's DNA under the victim's nails would have been helpful. Trial counsel testified that law enforcement described the knife as "wiped clean" and that the parties did not expect any DNA evidence to remain. He agreed that DNA evidence would not necessarily be apparent to the naked eye and that evidence that the knife contained DNA from a source other than the Petitioner would have been helpful at trial.

Trial counsel agreed that evidence that the knife contained DNA which excluded the Petitioner and victim could have been helpful, noting that he could have argued that the victim survived any altercation and that another male then attacked her and left DNA on the knife. On cross-examination, however, he agreed that the value of the DNA evidence recovered from the knife blade was limited because the victim was also excluded as a possible contributor. The DNA profile obtained from the handle was so limited that the results of comparison to standards from the Petitioner and victim were inconclusive.

Trial counsel believed the primary evidence against the Petitioner was the statement to police. The Petitioner was "anxious to be cooperative" and responded to questioning "by agreeing." When Detective Crumby stated, "Then you just defended yourself," the Petitioner agreed. In the statement, the Petitioner did not provide many details regarding the crime. Trial counsel acknowledged, however, that the Petitioner declined to answer certain questions at the beginning of the interview, demonstrating that the Petitioner was not simply agreeing with prosecutors but was aware of his constitutional right to remain silent. Trial counsel also agreed that Detective Crumby explicitly informed the Petitioner that the interview concerned the victim's death and that Detective Crumby provided numerous details regarding the death, making it unlikely that the Petitioner could believe that the questions related to some nonfatal altercation. Trial counsel confirmed that the Petitioner's response to a detailed description of the cause of death was to ask, "Is there such a thing as self-defense in this state?" The Petitioner also asserted in the interview that the proof appeared "irrefutable" and referenced

the victim's pulling out a small knife. On redirect examination, trial counsel testified that confessions can be unreliable and that he was familiar with cases in which DNA evidence had exonerated defendants. He agreed that raising reasonable doubt in the mind of the jury might have changed the result of the trial.

Trial counsel recalled that even shortly before trial, the Petitioner was vacillating between alternate theories, including self-defense, mistaken identity, and a third-party assailant. He observed that the victim's boyfriend, Mr. Harris, was "conveniently available" and had been in an argument with the victim the night before her death. Mr. Harris testified that the victim called him numerous times at 2:00 or 3:00 a.m. but that he refused to come to her house until the next morning, when he discovered the body. Mr. Harris had minor scratches on his hand and the back of his head. Trial counsel testified that scrapings were collected from under Mr. Harris's fingernails but that the scrapings were not tested and a DNA standard was not collected from Mr. Harris.

Trial counsel agreed with the prosecutor that there were hurdles to presenting Mr. Harris as the killer. He recalled that law enforcement performed tests which indicated an absence of blood on Mr. Harris's clothing and body, despite the fact that the murder scene was particularly bloody. Trial counsel agreed that law enforcement confirmed that Mr. Harris stayed the night with a friend on the night of the murder and that police later established that the telephone numbers the victim was using to contact Mr. Harris that night belonged to the Petitioner. Mr. Harris discovered the victim's body early in the morning when he went by to retrieve some belongings, and he immediately contacted police and cooperated with the investigation, while the Petitioner fled. Trial counsel agreed that the injuries to Mr. Harris's head were so minor that they were difficult to discern in the photographs of Mr. Harris taken by police, that his hands had very minor scratches and a contusion on his thumb, and that the injuries did not appear consistent with a fatal battle.

(Doc. No. 11-27 at 7–11.)

The state court went on to find that the petitioner was not entitled to relief because she had

failed to establish that her counsel's performance was deficient:

The Petitioner asserts that trial counsel was ineffective in failing to secure independent testing of the physical evidence which counsel knew had been collected. The State responds that the Petitioner has established neither deficiency nor prejudice.

The right to counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In evaluating a claim of ineffective

assistance of counsel, the court must determine "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 686).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)[)]. In evaluating counsel's performance, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316. "A reasonable probability of being found guilty of a lesser charge, or receiving a shorter sentence, satisfies the second prong of *Strickland*." *Pylant*, 263 S.W.3d at 869. Because both prongs must be established for relief, a court need not address both if the defendant has failed to prove either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

The post-conviction court found that trial counsel's failure to test the physical evidence for DNA was not deficient, and we agree. The Petitioner's presence in the victim's home was established by the circumstantial evidence of the dollar store receipt for two bottles of orange juice and the dollar store videotape showing the Petitioner retrieving and purchasing the orange juice at the time reflected on the

receipt. It could also be inferred from the telephone calls to Mr. Harris placed from the Petitioner's telephones. The Petitioner's statement acknowledged not only that the Petitioner was in the home bathing but also that the Petitioner and the victim engaged in an "altercation." The Petitioner's established presence in the home and statement about an altercation led trial counsel to infer that the Petitioner's DNA might be present at the crime scene. Trial counsel made a reasonable, strategic choice to avoid testing evidence which he rationally expected would produce results that were inculpatory to the Petitioner. While the results of the testing of the victim's fingernail scrapings ultimately proved favorable to the Petitioner, trial counsel's actions are not judged by 20-20 hindsight, *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997), but instead evaluated from counsel's perspective at the time, *Goad*, 938 S.W.2d at 369. We conclude that trial counsel made a reasonable strategic decision and did not perform deficiently in choosing not to test the physical evidence. *See Tremaine Roberson v. State*, No. W2014-00400-CCA-R3-PC, 2015 WL 5173067, at *4-5 (Tenn. Crim. App. Sept. 2, 2015) (concluding that decision to avoid DNA testing was a reasonable strategic decision); *Wayne E. Mitchell v. State*, No. 01C01-9507-CR-00227, 1996 WL 234053, at *2 (Tenn. Crim. App. May 9, 1996) (concluding that decision not to test DNA was a strategic choice and that "[c]ounsel's decision not to pursue a DNA test was based on a realistic apprehension of creating detrimental evidence that did not exist"); *cf. Tommy Nunley v. State*, No. W2003-02940-CCA-R3-PC, 2006 WL 44380, at *6 (Tenn. Crim. App. Jan. 6, 2006) (concluding that trial counsel's failure to request DNA analysis was not strategic but noting that "the decision to forego testing may rest firmly upon an informed decision or upon a strategic decision that a positive result could be fatal to the defendant's case"). The Petitioner has not shown that trial counsel performed deficiently and is not entitled to relief.

(Doc. No. 11-27 at 12–14.)

The Tennessee Court of Criminal Appeals correctly identified and summarized the *Strickland* standard applicable to the petitioner's claim. Accordingly, the question before this court is whether the state court applied *Strickland* reasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."). As discussed above, the AEDPA standard asks whether the state court's determination "involved an unreasonable application of" the law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). As the Supreme Court clarified in *Harrington*,

This is different from asking whether defense counsel's performance fell below

28

*Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

The petitioner disagrees with the state court's conclusion that counsel's lack of pursuit of DNA testing prior to trial was reasonable strategy in light of the overwhelming evidence that the petitioner was in the victim's apartment the night she was killed. She argues that

> Considering that all the evidence was circumstantial without any physical evidence and there are possible suspect [sic] in this case, (victim's boyfriend, Mr. Harris), had Petitioner's counsel tried to obtain the DNA evidence before the trial, the charge against Petitioner, more than likely, would have been dropped, and/or the jury would have found Petitioner not guilty for murder but manslaughter or lesser-included offense. Thus, trial defense counsel's failure not pursuing such valuable challenge is constitutionally deficient under *Strickland* test.

(Doc. No. 1 at 37.) That argument is not persuasive. The presence of another man's DNA under the victim's fingernails has no bearing on whether the petitioner's killing her would constitute a lesser-included offense of second-degree murder, and there is no reasonable likelihood that such evidence would have resulted in a dismissal of the charge against her in light of the other significant evidence implicating her. But more importantly, even if the petitioner's theory were sound, it would not establish that the state court's contrary conclusion is objectively unreasonable. The petitioner's argument that the state court's determination was incorrect does not satisfy her burden under AEDPA of demonstrating that the determination was *unreasonable.* Nor does the petitioner's allegation that counsel's homophobia was a motive to provide deficient representation establish that the representation was actually deficient.

The court observes that the petitioner addresses several distinct claims together in her rather convoluted presentation of Claim 4. In addition to her ineffective-assistance-of-trial-counsel claim, she asserts exhausted *Brady* and due process claims in connection with the post-trial DNA results, which the court addresses separately below as Claims 5 and 6. But she also makes a brief, vague assertion that "Post-Conviction counsel failed" in the presentation of a DNA-related claim. (Doc. No. 1 at 36.) To the extent that the petitioner intends for this statement to raise a habeas claim that post-conviction counsel was ineffective, that claim cannot form the basis for habeas relief (even if it were developed). Ineffective assistance of counsel during post-conviction proceedings does not raise a cognizable habeas claim, because there is no constitutional right to effective counsel at post-conviction. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

The petitioner is not entitled to relief on her ineffective-assistance claims presented in Claim 4.

E. *BRADY* VIOLATION

Detective Crumby testified at trial that after the petitioner gave his statement, Crumby did not think it was necessary to seek DNA testing on the evidence collected from the scene, including scrapings from the victim's fingernails. (Doc. No. 11-3 at 56, 63–69.) He acknowledged, however, that sometime prior to trial the evidence had been submitted for testing at the request of the prosecuting attorney. (*Id.* at 66.) The state-court record indicates that DNA test results revealing the DNA of an unknown male under the victim's fingernails were reported on August 4, 2011— while the petitioner's motion for new trial was pending—but were not shared with the petitioner

until September 26, 2012. (Doc. No. 11-27 at 8.) The petitioner claims that the prosecution withheld evidence of DNA testing of the victim's fingernail scrapings in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. No. 1 at 34.) The Tennessee Court of Criminal Appeals rejected that claim on post-conviction appeal:

> The Petitioner next asserts that the prosecution suppressed the evidence of the DNA testing, which ultimately proved favorable to the defense, and that the evidence should have been disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The State responds that the Petitioner's claim can only extend to the prosecution's act of submitting the fingernail scrapings for testing and not to the results of the testing, and the State argues that the Petitioner has failed to establish the requisites for a *Brady* claim.
>
> In *Brady*, the United States Supreme Court held that the suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Id.* In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A violation is established by showing that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995).
>
> The rule in *Brady* applies "not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Jackson*, 444 S.W.3d at 594 (quoting *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999)). This includes "evidence in police possession which is not turned over to the prosecution." *Id.*; *see Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 n.8 (2016) (noting that an inmate's statement made during trial to police required disclosure even if it was not known to the prosecutor). The prosecution is not, however, under a duty to disclose information that the accused either possesses or is able to obtain. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). Nor is there a constitutional requirement "'that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" *Id.* (quoting *State v. Walker*, 910 S.W.3d 381, 390 (Tenn. 1995)). *Brady*

requires an evaluation of any suppressed evidence cumulatively rather than in isolation. *Wearry*, 136 S. Ct. at 1007; *Kyles*, 514 U.S. at 436.

The post-conviction court found that the State submitted the fingernail scrapings for testing prior to trial but that the results were not available until after the Petitioner had been convicted. The post-conviction court concluded that the fact that the scrapings were submitted for testing was not requested in discovery, was not in itself favorable to the Petitioner, and was not material. The post-conviction court further found that while the results of the testing were favorable and had been requested in discovery, the State did not have the results at the time of trial and the results were not material given the strong evidence against the Petitioner. The Petitioner does not argue that the DNA testing of the knife, which was not performed until after the post-conviction petition was filed, was improperly withheld by the prosecution.

The prosecution's obligation to disclose exculpatory material is satisfied when the material is disclosed in time for the defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial); Wayne R. LaFave et al., 6 Crim. Proc. § 24.3(b) n.88 (4th ed. 2017). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Because a violation occurs only when the suppression of material exculpatory evidence prevents its effective use at trial, "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting Davis, 306 F.3d at 421).

Regarding the failure to disclose the fact that the clippings had been submitted for testing, we agree with the post-conviction court that the Petitioner has failed to establish a *Brady* violation. Initially, the Petitioner did not request information regarding the submission of items for testing, but only the results of such testing. We also agree with the post-conviction court that the mere fact that the samples had been submitted for testing was not in itself favorable to the Petitioner; on the contrary, all parties expected the testing to prove inculpatory. Trial counsel was aware that a DNA sample was taken from the Petitioner in February. Furthermore, trial counsel became aware that the items were submitted for testing during trial in May. While the Petitioner points to trial counsel's testimony that he would have requested a continuance had he known that the evidence had been submitted for testing, Detective Crumby in fact testified at trial that the evidence had been submitted for testing pursuant to the prosecutor's request. Trial counsel did not, in fact, request a continuance in light of this revelation. Neither was the mere fact that the items were submitted for testing material, as there is no reasonable probability that the result of the proceeding would have been different had the prosecutor

informed the defense earlier that testing was being performed. *See Cureton*, 38 S.W.3d at 77.

Whether the prosecution was obligated to turn over the results of the testing once the tests were performed presents a more difficult question. We note that the results of the testing, i.e., the discovery of the DNA of a biological male who was not the Petitioner under the victim's fingernails, is favorable to the Petitioner. Likewise, the Petitioner requested the evidence in discovery. Accordingly, we are left to consider suppression and materiality. *See Jackson*, 444 S.W.3d at 594.

It is clear that the prosecution has a continuing obligation to disclose exculpatory evidence which was in existence at the time of trial and sentencing. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("[T]he duty to disclose is ongoing..., and the court [after in camera review of sensitive evidence] would be obligated to release information material to the fairness of the trial."). However, in *District Attorney's Office for Third Judicial District v. Osborne*, the United States Supreme Court suggested that the prosecution's obligations under *Brady* were limited to trial evidence. 557 U.S. 52, 68 (2009). In *Osborne*, where the petitioner sought to compel the prosecution to produce physical evidence which the petitioner desired to test for DNA at his own expense in order to obtain post-conviction relief, the Supreme Court concluded that the Court of Appeals had committed error "in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest." *Id.* at 59, 68. The Court noted that no precedent would require the disclosure obligation to continue "after the defendant was convicted and the case was closed." *Id.* at 68. Noting that a valid conviction would rob a defendant of the presumption of innocence, the Court determined that the petitioner's right to due process "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Id.* at 69. The Court concluded that *Brady* was simply the "wrong framework" to address the prosecution's obligations to turn over evidence in post-conviction proceedings and instead considered whether the State of Alaska's post-conviction remedies were so deficient that they offended principles of justice and fundamental fairness. *Id.*

Here, the Petitioner was convicted in May and sentenced in July 2011. On August 4, 2011, the TBI issued its report to the "Metro Nashville P.D." confirming that the victim's fingernail scrapings contained male DNA which excluded the Petitioner as a potential contributor. Knowledge of exculpatory evidence is imputed to the prosecution when it is possessed by a State actor. *Jackson*, 444 S.W.3d at 594. It appears that the prosecution possessed the exculpatory material after the Petitioner's trial and sentencing but prior to the trial court's ruling on the motion for a new trial in September.

There is authority supporting both the contention that the prosecution's obligations under *Brady* extend through direct appeal and the contention that the obligations terminate with trial and sentencing. Some courts have interpreted *Osborne* to stand for the proposition that the prosecution is obligated to disclose only exculpatory material that was available at the time of trial or sentencing. *See Estrada v. Healey*, 647 Fed. App'x 335, 338 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 226 (2016) (noting

that the petitioner did not cite authority "establishing a due process right to the timely disclosure of exculpatory evidence discovered after his conviction" and that *Osborne* "explicitly declined to extend *Brady*'s pre-trial protections to the post-conviction context"); *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013) (noting that "it is inappropriate to consider evidence developed post-verdict" because the essence of a *Brady* claim requires evaluating how withheld evidence would have affected the jury); *Whitlock v. Brueggemann*, 682 F.3d 567, 587-88, 589 (7th Cir. 2012) ("As we have stressed, the continuing *Brady* obligation that applies ... covers only evidence that existed at the time of the original trials."); *see also Leonard D. Hutchison & James Harper v. State*, No. 03C01-9606-CR-00232, 1997 WL 789923, at *8-9 (Tenn. Crim. App. Dec. 23, 1997) (rejecting a *Brady* claim for the nondisclosure of FBI forms that were not created until after the trial).

On the other hand, some courts have concluded that the government's obligation to disclose exculpatory material extends through the conclusion of a direct appeal. *See Fields v. Wharrie*, 672 F.3d 505, 514-15 (7th Cir. 2012) (concluding in a 42 U.S.C.A. § 1983 suit that "a prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal and in the event of retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness"); *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) (concluding in a § 1983 suit that evidence discovered while prosecutors were involved in new trial and postconviction proceedings was subject to disclosure); *see also Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (accepting the government's concession that the prosecution's duty to disclose extended to evidence discovered prior to the ruling on the motion for a new trial).

We have determined that we need not address the issue of whether the prosecution was obligated to disclose the evidence which surfaced after trial and sentencing but prior to the ruling on the motion for a new trial. Even assuming that the prosecutor was obligated to disclose the information, the Petitioner has failed to demonstrate materiality under *Brady*. In *Smith v. Roberts*, the prosecution conceded that it was obligated to disclose exculpatory information which came to light after sentencing but prior to the motion for a new trial. 115 F.3d at 820. The appellate court noted that prompt disclosure would have allowed the petitioner to use the evidence in a motion for a new trial, and it concluded that "the proceeding upon which the [materiality] element must focus is the new trial motion, not the trial itself." *Id.* The Tenth Circuit concluded that the petitioner did not establish materiality because the post-conviction court evaluated his claim under the same standard that the trial court would have used to evaluate the motion for a new trial, and accordingly the delay did not affect the outcome of the motion for a new trial proceeding. *Id.*

We agree that under *Brady*, the materiality analysis must focus on prejudice accruing after the prosecution is imputed with an awareness of the evidence. Here, the Petitioner cannot establish a *Brady* claim based on the effect that the evidence would have had at trial because the Petitioner cannot establish, as an element of relief, that the prosecution suppressed evidence in its possession at trial. Indeed, not only was the evidence of the favorable DNA testing not in the prosecution's possession during trial, it did not exist at all. Accordingly, the materiality analysis

34

must focus on the point at which the evidence came into existence and into the prosecution's possession.

Here, had the prosecution disclosed the test results on August 4, 2011, the Petitioner could have amended the motion for a new trial to request relief. The Petitioner could likewise have filed a petition for error coram nobis based on the newly discovered evidence. However, the Petitioner has not articulated what claims were foreclosed by the delayed disclosure, nor has the Petitioner shown that the same claims could not have been asserted at the time that the defense actually became aware of the results of the testing. The Petitioner does not specify what errors could have been raised at the motion for a new trial that were precluded on post-conviction review. Accordingly, the Petitioner's claims regarding the results of the testing of the fingernail scrapings do not establish that the Petitioner is entitled to relief based on the prosecution's failure to timely disclose exculpatory material under *Brady*.

(Doc. No. 11-27 at 14–19.)

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court has articulated the components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The Tennessee Court of Criminal Appeals identified and adequately summarized this standard in the petitioner's case. Its lengthy analysis ultimately boiled down to two conclusions. First, the prosecution did not commit a *Brady* violation before trial, because the only fact in its possession at that time was that evidence had been submitted for testing, and that fact was not favorable to the petitioner and had not been requested by the petitioner. And second, there was no *Brady* violation in connection with the failure to promptly disclose the results received after trial, because—even assuming *Brady* obligations continue after a conviction—the results were

35

favorable but not material to the outcome of any proceedings in which they could have been presented at that point.

The petitioner has not established that the state court's first conclusion was unreasonable either as a matter of law or fact. The mere fact that the fingernail scrapings had been submitted for testing, in the absence of any results, was not favorable evidence the prosecution had a duty to disclose before trial. Moreover, the petitioner's counsel ably exploited any potential benefit from that fact once it was disclosed at trial by highlighting the lack of forensic testing results connecting the petitioner with the crime in both his cross-examination of Detective Crumby (Doc. No. 11-3 at 63–68) and in his closing argument:

> Now, suppose that we had done some forensic testing, suppose that the five bloody handprints going down the handrailing from the second floor to the door of the apartment building, suppose we knew whose blood that was, now, Ms. Burns maybe? I think there was a struggle. Could we also have some DNA that might possibly have represented the killer?
>
> Do we know what was underneath her fingernails? Was there any evidence there? What about, what about Red Harris' fingernail trimmings, could that have told us anything more? What about on the exit door of the apartment the exterior of it, there were two more bloody handprints, back upstairs in the bathroom on the – on the toilet bowl or the lid to it and on the base on the side of the thing they say there are suspected blood stains there too, yet none of them were tested and that evidence presented to you.
>
> On 5-21-2010 Detective Crumby wrote in his report that it was important, critically important for him to obtain the DNA of Clark Waterford in order to be able to do the analysis. He explained to you, that later he decided that he didn't need it, until he said . . . the district attorney's office asked him to get it and in fact he told you that on February 11th of this year that he did in fact obtain a search warrant to get the DNA from Mr. Waterford, he got it, and nobody ever tested it. Detective Crumby didn't feel that it was necessary.
>
> . . .
>
> Would that evidence, would scientific evidence be helpful to you in the determination of these issues I suggest to you the question is almost ridiculous in its obviousness, yet you have nothing there that can help you, nothing is being offered to you other than the peculiar and strange responses of Mr. Waterford to the one-hour long interrogation by Detective Crumby.

36

(Doc. No. 11-3 at 140–41.)  Prior disclosure of the still-pending tests, therefore, would not have benefitted the petitioner at trial.

The state court also concluded that the petitioner failed to establish that suppression of the test results, once they became available after her conviction, had any material impact on the outcome of her case at that point.  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).  Materiality for *Brady* purposes is a "difficult test to meet," and must be determined in light of the totality of the evidence, including the weight of the evidence of the petitioner's guilt. *See Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011).

The state court also reasonably concluded that the petitioner failed to establish that any post-trial claim was prejudiced by the delay in disclosure of the test results in question.  Although the petitioner was unable to rely on the results in proceedings on his motion for new trial, he had them long before he filed his post-conviction petition.  And, in addition to the instant *Brady* claim, the petitioner asserted in post-conviction proceedings that the DNA evidence from the victim's fingernails would have changed the outcome of his trial and that his conviction in the absence of that evidence violated his right to due process and required a new trial. (Doc. No. 11-18 at 96; Doc. No. 11-25 at 16–20.)  The petitioner lost on the merits of that claim (Doc. No. 11-27 at 19–26), which is addressed below in the context of his next habeas claim, and there is no basis to believe that he would have prevailed on the same claim if he had been able to raise it in his motion for new trial.

The petitioner is not entitled to relief on her *Brady* claim.

## F.     DUE PROCESS

Finally, the petitioner asserts that her trial in the absence of the DNA results from the victim's fingernail scrapings violated her right to due process. (Doc. No. 1 at 34.)  The petitioner argued on post-conviction appeal that the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution "includes a meaningful opportunity to present a complete defense," which was violated by trying her in the absence of DNA evidence that would have changed the outcome of her trial. (Doc. No. 11-25 at 14–16.)  The Tennessee Court of Criminal Appeals rejected her claim on the merits:

> The Petitioner next generally asserts that a trial in the absence of the late-discovered DNA evidence was a violation of due process and requires a new trial.
>
> . . .
>
> The Petitioner argues that trial in the absence of the DNA evidence resulted in the denial of due process, but the appellate brief contains no citation to any caselaw that stands for the proposition that due process mandates a new trial upon the discovery of favorable evidence after conviction.
>
> "[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967). However, the Due Process Clause has "limited operation" beyond the guarantees listed in the Bill of Rights, and "the category of infractions that violate 'fundamental fairness'" has been defined "very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990); *see Beuke v. Houk*, 537 F.3d 618, 639-40 (6th Cir. 2008) (noting that state court's ruling admitting victim impact testimony would constitute a constitutional violation only if it rendered the trial fundamentally unfair). Accordingly, the question is whether the action complained of violates those "'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Dowling*, 493 U.S. at 353 (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). The presumption of innocence no longer cloaks a defendant who has been convicted at a fair trial. *Herrera v. Collins*, 506 U.S. 390, 399 (1993). Instead, the court must determine whether the challenged conduct undermined the fundamental fairness of the entire trial. *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 162, 166, 168 (3d Cir. 2015) (affirming habeas corpus relief for petitioner who articulated a due process claim based on the fact that scientific evidence used to convict him had subsequently been discredited); *see also United States v. Candelaria-Silva*, 166 F.3d 19, 37 (1st Cir. 1999) (concluding that combination of *Brady* material and

newly discovered evidence did not create a reasonable probability of a different result at trial). When a petitioner alleges that evidence is admitted in violation of due process, the court analyzes the materiality of the evidence. *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000), *as amended on denial of reh'g* (Nov. 30, 2000).

The Petitioner asserts that the absence of the DNA evidence hampered the Petitioner's ability to present a defense, resulting in a due process violation. The United States Constitution guarantees a meaningful opportunity to present a complete defense, which "'includes the right to introduce evidence that someone other than the accused committed the crime.'" *State v. Bell*, 512 S.W.3d 167, 190 (Tenn. 2015) (quoting *State v. Rice*, 184 S.W.3d 646, 671 (Tenn. 2006)). "[T]he erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." *Id.* We observe, however, that the cases cited by the Petitioner analyze whether the defendant had a constitutional right to present evidence in existence at trial which was excluded according to the rules of evidence. *See Rice*, 184 S.W.3d at 673-74; *State v. Brown*, 29 S.W.3d 427, 433-34 (Tenn. 2000). To determine whether such exclusion of evidence rises to constitutional proportions, the court examines whether the excluded evidence is critical to the defense, whether the evidence bears sufficient indicia of reliability, and whether the interest supporting exclusion is substantially important. *Brown*, 29 S.W.3d at 434. We note that this last criterion does not fit easily into the contours of the Petitioner's claim and that the analysis cited by the Petitioner is not the correct framework for determining whether the Petitioner is entitled to relief based on the fact that new DNA evidence came into existence after trial. In any event, we conclude that the DNA evidence was not so material as to render a trial in its absence unconstitutional.

In *Wiley v. State*, the trial court granted the petitioner post-conviction DNA analysis of a towel found at the crime scene. 183 S.W.3d 317, 324 (Tenn. 2006). At trial, the petitioner, who acknowledged having struck the victim with a bottle, claimed that he did so in self-defense after the victim attacked him, and he told police that he was unaware of the severity of the victim's injuries when he left the victim. *Id.* at 320-21. The petitioner asserted that DNA analysis of the towel would reveal the petitioner's own blood and not the victim's blood, supporting the petitioner's contention that the victim attacked and injured him and that he was acting in self-defense. *Id.* at 322-23. The postconviction court granted testing, and the DNA test results revealed that the towel was indeed stained with the petitioner's own blood. *Id.* at 324. The Tennessee Supreme Court concluded that, while the DNA test results were favorable to the petitioner, the finding of favorable results would not in itself mandate the granting of a new trial. *Id.* at 329. Concluding that "[a]lthough the analysis established the presence of the petitioner's blood at the crime scene, that evidence alone did not establish the petitioner's innocence of the offenses," the court determined that the testing did not show that the verdict or sentence would have been more favorable had the evidence been available at trial, and it denied relief. *Id.* at 328-29.

In *Kenneth Alan Steele v. State*, the petitioner was granted DNA analysis but subsequently denied post-conviction relief. No. E2016-01375-CCA-R3-PC, 2018

WL 842936, at *1 (Tenn. Crim. App. Feb. 13, 2018), *perm. app. denied* (Tenn. June 6, 2018). The petitioner had committed numerous burglaries and rapes and sought testing of evidence obtained from the victims. *Id.* The results of the testing showed that the samples contained genetic material from multiple sources, but the petitioner was identified as a partial contributor in each sample. *Id.* at *3. This court upheld the denial of relief, noting that, despite the unidentified contributors in the genetic material, the petitioner's genetic material was also present and that his convictions were otherwise supported by strong evidence, including fingerprints. *Id.* Likewise, in *Steven Craig Griffin v. State*, the petitioner was granted DNA testing, and the test revealed that neither he nor his patrilineal relatives could be excluded as the perpetrator. No. M2008-00242-CCA-R3-PC, 2009 WL 564228, at *8 (Tenn. Crim. App. Mar. 5, 2009). This court affirmed the dismissal of the subsequent post-conviction petition, noting that the results of the testing were not favorable, despite the fact that the results could also implicate the petitioner's patrilineal relatives. *Id.*

We conclude that the Petitioner here has not established a violation of the principles of fundamental fairness under due process. *Dowling*, 493 U.S. at 352. We note that the Petitioner could have insisted on DNA testing prior to trial but did not seize the opportunity to do so. Neither has the Petitioner shown a reasonable probability that the results of the proceeding would have been different if the defense had had access to the subsequently performed DNA analysis. *Wiley*, 183 S.W.3d at 328-29. DNA testing cannot, in itself, always resolve a case. *Osborne*, 557 U.S. at 62. "Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Id.*; *see Willie Andrew Cole v. State*, No. M2015-02087-CCA-R3-PC, 2016 WL 4972384, at *4 (Tenn. Crim. App. Sept. 18, 2016) (denying DNA testing based on the conclusion that even if the victim's fingernails yielded DNA from some person other than the petitioner, the overwhelming proof at trial precluded a finding of a reasonable probability of a different result); *Donnie E. Johnson* [*v. State*, No. W2006-02208-CCA-R3-PD], 2007 WL 852147, at *7 [(Tenn. Crim. App. Jan. 9, 2007)] (denying DNA testing because even if the DNA analysis showed that a plastic bag used in the crime contained DNA linked to someone else, the probability that the bag had been handled by numerous people precluded a reasonable probability that the petitioner would not have been convicted or prosecuted).

. . .

While genetic material from a male other than the Petitioner under the victim's fingernails is certainly favorable evidence, we cannot say that the evidence is so strong that there is a reasonable probability that the absence of the evidence at trial affected the results of the proceedings. *See Wiley*, 183 S.W.3d at 328-29. Although the evidence had exculpatory value, it was not exonerating. At trial, Detective Crumby testified that he did not believe the fingernail scrapings required testing, in part because genetic material under the victim's fingernails could have come from domestic contact. Detective Crumby testified, for instance, that his DNA would probably be present under his wife's fingernails. The crime scene showed signs of a struggle, in that various items were knocked over or broken. However, there was also testimony that the victim would throw things when she was intoxicated. The

medical examiner testified that the victim had no defensive wounds on her hands. He also testified that the blood evidence was consistent with the victim's having been stabbed as she lay in bed and that the blow to her head may have rendered her unconscious. Accordingly, the physical evidence did not necessarily suggest that the murderer's DNA would be present under the victim's fingernails.

The evidence at trial established that the Petitioner was present in the victim's home on the night of her death. After buying two bottles of orange juice at the dollar store, the Petitioner entered the victim's home. The victim used the Petitioner's telephone to call Mr. Harris multiple times between 9:00 and 10:00 p.m. At some time that night, the victim was stabbed and bled to death. The murderer then made two incisions under her breasts, in a location that would not normally be exposed. The Petitioner left a bag with the receipt from the dollar store in an upstairs bedroom of the victim's home and subsequently fled the State. When questioned about the murder by police, the Petitioner's response was to ask if Tennessee recognized self-defense. The Petitioner admitted to being involved in an altercation with the victim after inadvertently using the victim's towel. The Petitioner told Detective Crumby that the victim began throwing things and "pulling that little knife." When Detective Crumby suggested, "Then you just defended yourself," the Petitioner responded, "Right." The jury convicted the Petitioner of second degree murder. We conclude that evidence of DNA under the victim's fingernails was not so exculpatory that it would undermine confidence in the verdict or that it raises a reasonable probability of a different result at trial.

(Doc. No. 11-27 at 19–26.)[3]

Thus, the state court essentially concluded that there was no reasonable likelihood that the presence of someone else's DNA under the victim's fingernails would have resulted in his acquittal at trial. The question on habeas review under AEDPA is not whether this court agrees with that conclusion, but whether it is objectively unreasonable. Although the court has serious concerns about this claim, as discussed below, it cannot find that the state court's determination was so unreasonable that it was beyond all fair-minded debate, as required to grant habeas relief. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") This is particularly true because the constitutional right on which

---

[3] It is clear from the state court's opinion that it recognized that the petitioner was raising a federal constitutional claim and considered the claim as such. This court, therefore, rejects the respondent's argument that the petitioner did not fairly present this claim to the state courts. (*See* Doc. No. 13 at 36–37.)

the petitioner's claim rests—due process—is so general that it permits a great deal of discretion in its application. *See id.* ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

This court is concerned that the petitioner might have been prejudiced at trial by the absence of the favorable DNA results in conjunction with Detective Crumby's repeated assertions during the recorded interview, which was played for the jury, that DNA testing would incriminate the petitioner. During that interview, Detective Crumby said multiple times that he was confident that the DNA found at the scene would be tested and revealed to be the petitioner's. Early in the interview Crumby said law enforcement had "found a lot of DNA evidence," including evidence collected from under the victim's fingernails, and told the petitioner "I believe in a couple of months the DNA evidence will come back and it will show me that you were the one that was fighting with her." (Doc. No 11-7 at 43.) Near the end of the interview, he said "I know the DNA when it comes back under her fingernails and the other DNA in the place is going to show yours." (*Id.* at 61.) Those statements, played for the jury, could have planted the seeds in the jury's mind to assume—incorrectly—that the DNA under the victim's fingernails was indeed the petitioner's, which could have been a factor in the decision to convict him.

Those possibilities, however, must be weighed in context. Detective Crumby testified at trial that during the interview he used certain techniques to minimize the crime and keep the petitioner talking (Doc. No. 11-3 at 49) and that, essentially, some of what he said to the petitioner was untrue, including the statements that Crumby had already sent the DNA to be tested before the interview. (*Id.* at 55–56.) In fact, Crumby testified, he did not even believe the testing was

42

necessary after the petitioner's interview, and it was only submitted for testing later at the prosecutor's request.[4] (*Id.* at 56, 64–66.)  Accordingly, in response to prompting by defense counsel, the trial court instructed the jury as follows before the interview recording was played:

> [D]uring the interview Detective Crumby is an experienced, trained very capable detective and he will use his interview techniques which he has already mentioned earlier.
>
> In the tape when you are listening to it, he will probably have a lot of things to say and questions and suggestions and whatever else.  I haven't heard it, but I have already learned about it.  I want to remind you that what the defendant says is what the evidence really is and what Mr. Crumby, Detective Crumby would say, that is what his questions are and what his suggestions are and whatever else, but in the final analysis when you are considering it for whatever evidence you are going to use in your deliberations and the weight of it you are mainly needing to focus on what the defendant is saying moreso than what the detective is saying[.]

(*Id.* at 52–53.)  The trial court thus instructed the jury in effect that it should not consider Detective Crumby's statements in the recorded interview as proof of facts, but rather as his suggestions as part of an interview technique that, according to Crumby's testimony, included some deception. This court must presume the jury followed that instruction. See *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)  ("A jury  is presumed to follow its instructions.").

Moreover, defense counsel forced Detective Crumby to acknowledge on cross-examination that he still did not know "for a scientific fact" that his suppositions about the forensic evidence were true (Doc. No. 11-3 at 66–67), and Detective Crumby volunteered that he believed the DNA evidence, including the fingernail scrapings, were inconsequential in light of the undisputed fact that the petitioner had been at the scene. (*Id.* at 65.)  And, as discussed above,

---

[4] The state court records indicate that the petitioner's interview took place on June 21, 2010 (Doc. No. 11-7 at 42), and the state did not request DNA testing on the victim's fingernail scrapings until March 3, 2011, less than three months before trial. (Doc. No. 11-19 at 4.)

43

defense counsel relied heavily on the lack of forensic evidence to support the state's case in his closing argument. (*Id.* at 140–41.)

Finally, as the state appellate court pointed out, the physical evidence at the scene was consistent with an attack on the victim while she was lying down, without any defensive struggle. The absence of a defendant's DNA under a victim's fingernails does not establish her innocence when there was "no evidence offered suggesting that the victim scratched her assailant." *Rowe v. Giroux*, No. 3:13-CV-02444, 2016 WL 3513401, at *6 (M.D. Pa. June 1, 2016), *report and recommendation adopted*, No. 3:13-CV-02444, 2016 WL 3511544 (M.D. Pa. June 27, 2016). It was thus not unreasonable for the state court to conclude that the DNA evidence from the victim's fingernails was not so critical to the outcome of the case that its absence rendered the trial fundamentally unfair.

Accordingly, the petitioner is not entitled to relief on this claim. However, because of the court's concerns expressed above, the court will grant a certificate of appealability on this claim.

## V.     CONCLUSION

For the foregoing reasons, the petitioner is not entitled to relief on any of her claims.

Accordingly, the court will deny the requested relief and dismiss the petition.

An appropriate order shall enter.

ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE